> If you do not respond to this document within applicable time limits, judgment could be entered against you as requested.

D<sup>on</sup> JAMES K. ORD III Esq. (14007)
The Ord Firm, PC
P.O. Box 16688
Salt Lake City, UT 84116
Telephone: +1.310.494.6296
Fax: +1.801.901.8181
E-mail: James.Ord@TheOrdFirm.com

*Attorney for Plaintiff*

IN THE THIRD DISTRICT COURT IN AND FOR THE
COUNTY OF SALT LAKE, STATE OF UTAH

| | |
|---|---|
| WHITNEY BURDETT,<br>    Plaintiff. <br><br>v.<br><br>THE UNIVERSITY OF UTAH, an organ of the State of Utah<br><br>AND<br><br>UNIVERSITY OF UTAH POLICE DEPARTMENT,<br><br>AND<br><br>UNIVERSITY OF UTAH POLICE DEPARTMENT DEPUTY CHIEF CARVER,<br><br>AND<br><br>UNIVERSITY OF UTAH POLICE DEPARTMENT DETECTIVE EGAN | **VERIFIED COMPLAINT**<br><br>Case No. _____<br><br>Judge: _____ |

| | |
|---|---|
| AND | ) |
| | ) |
| UNIVERSITY OF UTAH POLICE DEPARTMENT DETECTIVE DAVIS | ) ) ) |
| AND | ) ) |
| UNIVERSITY OF UTAH POLICE DEPARTMENT LT. WAHLIN | ) ) ) ) |
| Defendants. | ) ) |
| (All Defendants hereinafter collectively referred to as "Defendants") | ) ) ) ) |

COMES NOW Plaintiff, Whitney Burdett, by and through Counsel, hereby complains against Defendants, THE UNIVERSITY OF UTAH, UNIVERSITY OF UTAH POLICE DEPARTMENT, DEPUTY CHIEF CARVER, LT. WAHLIN, DETECTIVE EGAN, and DETECTIVE DAVIS, and alleges and complains as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this action pursuant[1] to the laws of the State of Utah.

2. Venue is proper in this Court because the acts and omissions giving rise to this action occurred in Salt Lake County, Utah, where the University of Utah and its Police Department are located.

### PARTIES

3. Plaintiff, is an adult individual residing in Salt Lake County Utah.

4. Defendant, THE UNIVERSITY OF UTAH, is a public institution of higher education and an agency of the State of Utah, located in Salt Lake City, Utah.

5. Defendant, UNIVERSITY OF UTAH POLICE DEPARTMENT, is a law enforcement agency operating under the authority and control of the University of Utah, located in Salt Lake City, Utah.

6. Defendant, DEPUTY CHIEF CARVER, is believed to be an individual employed by the University of Utah Police Department in a supervisory capacity at the time of the events described herein.

7. Defendant, DETECTIVE EGAN, is believed to be an individual who was at the time employed by the University of Utah Police Department in an investigative capacity at the time of the events described herein.

8. Defendant, DETECTIVE DAVIS, is believed to be an individual employed by the University of Utah Police Department in an investigative capacity at the time of the events described herein.

9. Defendant, LT. WAHLIN, is believed to be an individual employed by the University of Utah Police Department in a supervisory capacity at the time of the events described herein.

## GENERAL FACTUAL ALLEGATIONS

13. Plaintiff was employed as a security officer at the University of Utah hospital for approximately two years prior to April 2024, and her HR record was exemplary with no incidents.

14. Plaintiff sought to advance her career and applied for a position with the University of Utah Police Department.

15. On or about April 24, 2024, the University of Utah Police Department hired Plaintiff and sponsored by that organization was to attend POST.

16. In approximately March 2024, Sgt. Whittaker advised Plaintiff that POST would not allow ears to be gauged and asked if that would be a deal breaker for her. Plaintiff agreed to have corrective surgery to close her ear gauge holes.

17. Approximately on April 10, 2024, Plaintiff gave two weeks' notice of her resignation from the University of Utah hospital.

18. On or about April 24, 2024, Plaintiff signed Offer of Employment to begin POST.

19. On or about May 13, 2024, Plaintiff began POST.

20. On or about May 21, 2024, Plaintiff was pulled out of POST class by Sgt. Hamlin and escorted to the third-floor administrative office. Sgt. Timpson and another unidentified Sergeant were present and questioned her about her background, referencing the background she had submitted for POST. Plaintiff confirmed its accuracy.

21. Defendants then presented Plaintiff with a document showing an expunged record from 2008. Plaintiff stated she had no knowledge of the underlying charge and questioned whether court involvement would have been necessary for an expungement, to which Defendants replied in the affirmative. They questioned her about alleged drug or domestic violence charges, which Plaintiff adamantly denied, stating she had only minor traffic violations.

22. Plaintiff offered to retrieve her driving record to demonstrate the nature of her violations, but Defendants declined and instructed her to investigate the expunged record at the Sandy City courthouse during her lunch break.

23. At the courthouse, Plaintiff paid a $35 fee to unseal the file, which revealed that the "charge" was for an expired registration/failure to appear, a matter for which Plaintiff had not sought expungement. Plaintiff had paid the ticket and reinstated her registration

immediately in 2008.

24. Plaintiff learned that the justice court had automatically processed an expungement upon payment of the ticket.

25. Plaintiff provided a copy of the court printout to Sgt. Timpson upon her return to POST and later sent a memorandum explaining the situation as requested.

26. On or about May 30, 2024, a University of Utah officer appeared at Sandy Justice Court to gather a court docket for a citation concerning "improper handlebar/peg placement."

27. On or about May 31, 2024, Plaintiff underwent surgery to close her ear plug holes to meet the job requirements.

28. On or about June 4, 2024, Plaintiff was again pulled from class and met with Detective Egan and Detective Davis. They reiterated questions about the expungement, and Plaintiff again explained it was automatic and unintentional. They then inquired about her credit and collections history, to which Plaintiff referred them to her divorce decree, which she had provided, indicating it was marital debt.

29. Defendants then questioned Plaintiff about alleged current arrest warrants in Salt Lake City, which she denied, stating she had only minor traffic violations, the last being in 2009.

30. Defendants then informed Plaintiff of a charge for "improper handlebar/peg placement" on a motorcycle. Plaintiff stated she had never owned or driven a motorcycle. Defendants marked the items Plaintiff disputed and said they would investigate. Detective Egan stated he would conduct his investigation, and Plaintiff was sent back to class.

31. Plaintiff's background did show an "improper placement violation." Upon further

investigation, this was discovered to be a clerical error by the court. The violation was a traffic violation related to her Saturn vehicle, which Plaintiff had disclosed during her hiring process.

32. On or about May 30, 2024, a University of Utah officer pulled the full DMV report for this incident, which clearly showed the license plate was for Plaintiff's car, not a motorcycle.

33. Defendants, including the detectives and the officer who pulled the DMV record, knew or should have known that the "improper handlebar/peg placement" ticket was: (a) a traffic ticket for Plaintiff's Saturn; (b) disclosed by Plaintiff during her hiring process; and (c) not related to a motorcycle.

34. It took Plaintiff nearly eight months to learn that the entire "improper handlebar/peg placement" ticket was an error and that Defendants knew or should have known of this error at the time of her termination.

35. In addition, the background check was supposed to only be for the prior 10 years. The traffic ticket that was for "improper handlebar/peg placement" occurred 16 years prior and was not meant to have any bearing on the background investigation.

36. This is pertinent where other non female candidates had serious crimes and infractions including drugs charges on their records prior to the 10 year window but they were treated differently than Plaintiff.

37. On or about June 10, 2024, Plaintiff was injured during Defensive Tactics (DT) and was placed on leave from DT pending recovery but continued to attend all other classes.

38. On or about June 12, 2024, Plaintiff was called to the administrative level again and met with Deputy Chief Carver, Lt. Wahlin, and Sgt. Bench.

39. Deputy Chief Carver handed Plaintiff a paper and informed her that they had decided to "separate" with her, meaning she was being terminated.

40. When Plaintiff asked for the reason for her termination, she was told it was due to her background information. Plaintiff reiterated that the motorcycle charge was not hers.

41. Deputy Chief Carver asked Plaintiff if they had covered "Brady" or "Giglio" in class yet.

42. Lt. Wahlin stated they would contact Plaintiff about returning her equipment and asked her to sign her termination form.

43. Plaintiff signed the termination form, which stated the reason for release/separation was "unmet departmental performance standards" during her probationary period.

44. Lt. Buck from POST subsequently informed Plaintiff she was expelled from POST due to the loss of her sponsoring police agency.

45. On or about June 12, 2024, Lt. Wahlin texted Plaintiff to inquire about her well-being and arrange the return of her equipment. Plaintiff suggested a fellow officer in her neighborhood could pick it up, which Lt. Wahlin arranged.

46. Plaintiff was distressed by the events, particularly given her injury sustained on the job, her recent surgery at Defendants' requirement, and her status as a single parent whose career aspirations had been abruptly ended.

47. On or about June 13, 2024, Plaintiff submitted a GRAMA request for her background information from the University of Utah.

48. On or about June 13, 2024, Plaintiff reapplied for a supervisor position at the University of Utah Hospital Security. Her former supervisor, Keith Livingston, informed her she would have to go through the hiring process.

49. On June 20, 2024, Plaintiff emailed Lt. Wahlin requesting a meeting to discuss her

termination and obtain her background report.

50. Lt. Wahlin responded that they do not have follow-up meetings with employees deemed "unfit for hire" and stated the termination was due to the charges discussed with the detectives.

51. Plaintiff replied that those charges were not hers and that she had never owned a motorcycle.

52. Lt. Wahlin reiterated that Plaintiff was fired due to her background, despite the separation form stating "unmet departmental performance standards."

53. On June 24, 2024, Plaintiff applied for a lower-level floor position at the hospital due to concerns about the supervisor role being filled and her urgent need for employment.

54. On July 1, 2024, Plaintiff received her first "Notice of Extension" regarding her GRAMA request.

55. On or about July 3, 2024, Plaintiff's friend, a hospital employee, was informed by administration that Plaintiff should not expect a call regarding her reapplication.

56. On July 3, 2024, Plaintiff received an email from the University of Utah denying her application for the floor position.

57. On August 12, 2024, Plaintiff received a second "Notice of Extension" regarding her GRAMA request.

58. On August 23, 2024, Plaintiff's GRAMA request was denied.

59. On September 4, 2024, Plaintiff appealed the GRAMA request denial.

60. On September 28, 2024, Plaintiff's GRAMA request appeal was denied.

61. Between June 17, 2024, and August 30, 2024, Plaintiff was unemployed and applied for positions at a minimum of three companies per week.

62. During her unemployment, Plaintiff was forced to withdraw funds from her 401K, incurring tax penalties, to cover her living expenses.

63. On or about September 3, 2024, Plaintiff obtained employment at the Drivers License Division.

64. On or about October 31, 2024, Plaintiff definitively learned that the alleged motorcycle ticket was for her Saturn and that she had disclosed this traffic violation in her initial background check. She further learned that the University of Utah had pulled the DMV record and possessed all the information to verify the error and Plaintiff's truthful disclosure.

65. Plaintiff had disclosed every incident on her record available to her at the time of application.

66. Plaintiff was an exemplary student in POST with excellent marks.

67. In fact, POST cleared Plaintiff's background, they have expressly stated that don't have any reason to deny her entry to POST.

68. POST has specifically told her that the the Plaintiff is eligible for POST certification as long as she has a sponsoring agency. This was after POST received all of the same data on the "handlebar" ticket expungement, that the University of Utah Police Department received.

69. There was no legitimate reason for Plaintiff's termination, which was a direct result of Defendants' negligence in failing to properly investigate the readily available information regarding the traffic violation, even after Plaintiff explicitly stated the motorcycle charge was incorrect.

70. A simple review of the readily available data would have revealed the error within

minutes.

71. Plaintiff was terminated while recovering from a work-related injury.

72. The University of Utah Police Department's communication to the University administration that Plaintiff was "not hirable" directly resulted in the denial of her reapplication at the hospital.

73. As a result of Defendants' actions, Plaintiff experienced months of unemployment and was ultimately forced to accept a position at the Division of Motor Vehicles paying approximately $40,000.00 per year less than the potential salary with the University of Utah Police Department.

74. Plaintiff has suffered significant harm to her career in law enforcement, financial losses, emotional distress, and reputational damage.

75. Plaintiff underwent surgery to alter her body at the direct request and requirement of the Defendants as a condition of employment.

## CAUSES OF ACTION

## COUNT I: NEGLIGENCE

72. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 71 as if fully set forth herein.

73. Defendants owed a duty of care to Plaintiff to conduct a reasonable and competent background investigation, to accurately assess the information obtained, and to make employment decisions based on accurate and reliable information. This duty arose from the employer-employee relationship and the prospective employer-employee relationship.

74. Defendants breached their duty of care by, inter alia: a. Failing to adequately and competently investigate the alleged "improper handlebar/peg placement" ticket despite Plaintiff's repeated assertions that it was not hers and involved a motorcycle she never owned. b. Failing to properly review the DMV record, which was obtained on May 30, 2024, and which clearly identified the vehicle as Plaintiff's Saturn and confirmed the violation was a traffic matter she had disclosed. c. Making employment decisions based on inaccurate and easily verifiable misinformation. d. Failing to correct the erroneous information despite having the means and opportunity to do so.

75. As a direct and proximate result of Defendants' negligence, Plaintiff suffered damages, including but not limited to: loss of employment, loss of future earning capacity, costs associated with the unnecessary surgery, emotional distress, reputational damage, and financial losses.

## COUNT II: GROSS NEGLIGENCE

76. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 75 as if fully set forth herein.

77. Defendants' conduct, as described above, constituted gross negligence, which is the failure to exercise even a slight degree of care, or conduct that demonstrates a willful, wanton, or reckless disregard for the rights and safety of others.

78. Defendants exhibited gross negligence by, inter alia: a. Ignoring Plaintiff's clear and repeated statements that the motorcycle ticket was not hers and failing to conduct a basic investigation that would have immediately revealed the error. b. Proceeding with termination despite possessing the DMV record confirming the error and Plaintiff's truthful disclosure. c. Demonstrating a reckless disregard for the truth and for Plaintiff's

employment and career prospects.

79. As a direct and proximate result of Defendants' gross negligence, Plaintiff suffered damages, including but not limited to: loss of employment, loss of future earning capacity, costs associated with the unnecessary surgery, emotional distress, reputational damage, and significant financial losses. Plaintiff is also entitled to punitive damages due to Defendants' gross negligence.

## COUNT III: DEFAMATION

80. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 79 as if fully set forth herein.

81. Defendants, through their agents and employees, including but not limited to Lt. Wahlin, made false and defamatory statements to third parties, including but not limited to University of Utah administration and potentially other prospective employers, by stating or implying that Plaintiff was "unfit for hire" due to her background and by misrepresenting the nature of her background.

82. These statements were false because, as Defendants knew or should have known, the primary basis for Plaintiff's termination was an erroneous traffic ticket that she had disclosed and that did not reflect negatively on her honesty or integrity.

83. Defendants published these false statements to third parties. The communication to University administration directly led to the denial of Plaintiff's reapplication at the hospital. The communication of Plaintiff being "not hirable" to other entities caused damage to her ability to secure employment.

84. The defamatory statements concerned Plaintiff's fitness for employment and directly harmed her reputation and ability to pursue her chosen profession.

85. Defendants acted with malice or reckless disregard for the truth in making these defamatory statements, particularly given their knowledge of the inaccuracies in the alleged background information.

86. As a direct and proximate result of Defendants' defamation, Plaintiff has suffered damages, including but not limited to: reputational damage, emotional distress, loss of employment opportunities, and financial losses.

## COUNT IV: DISCRIMINATION PURSUANT TO THE AMERICANS WITH DISABILITIES ACT (ADA)

87. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 86 as if fully set forth herein.

88. Plaintiff sustained an injury during Defensive Tactics (DT) on or about June 10, 2024, and was placed on leave from physical training pending recovery, but continued to attend all other classes. This injury substantially limited one or more of her major life activities, including but not limited to physical exercise and working, thereby constituting a disability within the meaning of the ADA.

89. Despite Plaintiff's injury and disability under the Americans with Disabilities Act Plaintiff was still able to perform her job duties and it was clear from her injury and medical reports that she was in fact only temporarily disabled.

90. Plaintiff's termination documents stated that she was terminated due to "unmet departmental performance standards" during the probationary period.

91. The only performance standards that Plaintiff could not meet, and did not meet, during her brief employment were the physical fitness standards that were required of her during the few days where her on the job injury prevented her from engaging in full

physical activity.

92. As a direct and proximate result of Defendants' discrimination pursuant to the Americans with Disabilities Act, Plaintiff suffered damages, including but not limited to: loss of employment, loss of future earning capacity, lost costs associated with the unnecessary surgery, emotional distress, reputational damage, and significant financial losses.

93. Pursuant to the ADA Plaintiff is entitled to injunctive relief.

## COUNT V: DISCRIMINATION PURSUANT TO TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED (42 U.S.C. § 2000e, et seq.)

94. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 83 above as if fully set forth herein.

95. Title VII of the Civil Rights Act of 1964 prohibits discrimination in employment based on race, color, religion, sex, or national origin.

96. Plaintiff is a female.

97. Defendants, The University of Utah and the University of Utah Police Department, are employers within the meaning of Title VII.

98. Defendants subjected Plaintiff to disparate treatment based on her sex by, among other things: a. Conducting a flawed and negligent background investigation that led to her wrongful termination. b. Failing to adequately investigate and correct the erroneous information regarding the alleged motorcycle violation, despite Plaintiff's repeated denials and readily available evidence to the contrary. c. Terminating Plaintiff's employment based on inaccurate and irrelevant information. d. Treating Plaintiff differently than similarly situated male applicants or employees who did not face similar

erroneous background check issues or whose errors were appropriately investigated and resolved. e. Communicating to other departments within the University that Plaintiff was "not hirable," thereby preventing her reemployment.

99. As a direct and proximate result of Defendants' discrimination pursuant to her sex, Plaintiff suffered damages, including but not limited to: loss of employment, loss of future earning capacity, lost costs associated with the unnecessary surgery, emotional distress, reputational damage, and significant financial losses.

## PRAYER FOR RELIEF

Plaintiff comes before the bar of justice seeking unspecified compensatory damages, and punitive damages, a Jury trial for all issues of Fact, and a Bench Trial for all issues of Law

**THIS SPACE LEFT INTENTIONALLY BLANK**

STATE OF UTAH            )
                         :SS
COUNTY OF SALT LAKE )

I Whitney Burdett Swear and Affirm that the facts contained in this pleading are true to the best of my recollection and records.

_____
Whitney Burdett

SUBSCRIBED AND SWORN to before me this 29th day of April 20 25.

ALISON ALLEN
NOTARY PUBLIC • STATE OF UTAH
COMMISSION NO. 724256
COMM. EXP. 04/19/2026

_____
NOTARY PUBLIC

Approved as to form and

RESPECTFULLY submitted on this 2nd day of May 2025

                                          *Dn. James K. Ord III, Esq.*
                                          Dn. JAMES K. ORD III Esq.
                                          The Ord Firm, P.C.
                                          *Attorney for Plaintiff*